**PUBLIC CITIZEN, INC.,**
**et al., Plaintiffs,**

v.

**PINELLAS COUNTY, et**
**al., Defendants.**

**No. 8:01CV943T–23TGW.**

United States District Court,
Tampa Division.
M.D. Florida.

May 19, 2004.

Robert R. Hearn, Zuckerman Spaeder, L.L.P., Tampa, FL, Bonnie I. Robin–Vergeer, Alan B. Morrison, Public Citizen Litigation Group, Washington, DC, Geoffrey W. Peters, Geoffrey W. Peters, P.C., Vienna, VA, for Public Citizen, Inc., Public Citizen Foundation, Inc., Greenpeace, Inc., Greenpeace Fund, Inc., American Charities for Reasonable Fundraising Regulation, Inc., DMA–Nonprofit Federation.

Carl E. Brody, Jr., Pinellas County Attorney's Office, Clearwater, FL, for Pinellas County, a political subdivision of the State of Florida, Sheryl Lord, Director, Pinellas County Department of Consumer Protection.

### *ORDER*

MERRYDAY, District Judge.

Public Citizen, Inc., and Public Citizen Foundation, Inc. (collectively, "Public Citizen"); Greenpeace, Inc., and Greenpeace Fund, Inc. (collectively, "Greenpeace"); American Charities for Reasonable Fundraising Regulation, Inc. ("American Charities");[1] and the Direct Marketing Association, Inc. ("DMA")[2] (collectively, the "charities"), move for summary judgment to enjoin the enforcement of Pinellas County Ordinance No. 93–106 (the "ordinance"), which regulates the solicitation of charitable contributions in Pinellas County

---

1. American Charities appears on behalf of both its member and its supporter charitable organizations (Docs. 1 & 51).

2. DMA appears on behalf of its member charitable organizations (Docs. 1 & 50).

(Docs. 42 & 43).[3] The charities assert claims pursuant to Section 1983 of Title 42, United States Code (Doc. 1), and contend that the ordinance on its face and as applied to the charities violates the United States Constitution (Doc. 43).[4] Specifically, the charities contend that the ordinance (1) imposes an impermissible prior restraint of protected speech in violation of the First Amendment, (2) imposes an unreasonable burden on protected speech in violation of the First Amendment, and (3) unduly burdens interstate commerce in violation of Article I's Commerce Clause (Doc. 1).[5] The charities contend that the ordinance fails to achieve its stated purpose of preventing deception, fraud, and misrepresentation and of promoting the disclosure of information useful to a potential donor.

Pinellas County and Sheryl Lord, the director of the county's Department of Justice and Consumer Services[6] (collectively, the "county"), move for summary judgment and argue that the ordinance (1) is narrowly tailored to advance a substantial interest and (2) comports with the Commerce Clause (Doc. 59).[7] In addition, the county contends that an earlier action by fundraising consultants, in which American Charities appeared, adjudicates the charities' claims and renders this action an impermissible "second bite at the apple" (Doc. 60).

## I. BACKGROUND

### A. The Pinellas County Charitable Solicitation Ordinance

Promulgated pursuant to Section 496.421, Florida Statutes,[8] the ordinance requires the registration of any charitable organization (and any sponsor,[9] federated fundraising organization,[10] or professional

---

3. Pinellas County Code §§ 42–266 to 42–344.

4. The charities describe the ordinance as "among the most oppressive [charitable solicitation ordinances] exacted by any jurisdiction in the country" (Doc. 43). Public Citizen, Greenpeace, and other charities, including members of DMA and of American Charities, refrain from "solicitation of nonmembers residing in Pinellas County to avoid the heavy burden and expense of registering there" (Docs. 46, 48, 50, 51, & 56). Public Citizen suppressed an estimated 27,662 mailings to Pinellas County residents in fiscal years 2000 and 2001 combined (Doc. 47).

 The charities concede that the county's October 15, 2002, repeal of Section 42–310 of the ordinance, regulating internet solicitation, renders moot the charities' fourth claim (Doc. 81).

5. In support of their motion, the charities filed several briefs (Docs. 43 & 70), excerpts from discovery requests (Doc. 44), numerous declarations (Docs. 46–48 & 50–56), deposition excerpts (Doc. 58), and other exhibits (Docs. 57 & 71).

6. Recently, the county renamed the Department of Consumer Protection, the name used in earlier versions of the ordinance and in the parties' submissions, as the Department of Justice and Consumer Services (Doc. 88).

7. In support of its motion, the county filed several briefs (Doc. 60 & 83) and a volume of exhibits (Doc. 60).

8. *See* Pinellas County Code § 42–267. Chapter 496, Florida Statutes, the Solicitation of Contributions Act, codifies the state's charitable solicitation law. The Solicitation of Contributions Act does not "preempt more stringent county ... provisions ..., [and] such provisions must be complied with if the registrant desires to solicit within the geographic district of such local unit of government." Fla. Stat. § 496.421.

9. The ordinance defines "sponsor" as "a group which hosts an event or solicits contributions on behalf of a charitable organization." Pinellas County Code § 42–266.

10. The ordinance defines "federated fundraising organization" as "a federation of independent charitable organizations which have voluntarily joined together, including, but not limited to, a United Way or community chest,

solicitor[11]) that desires to solicit a charitable contribution in Pinellas County from other than a "member" of the charitable organization. Pinellas County Code § 42–272(a). A charitable organization may not "contract with any professional solicitor, federated fundraising agency, or sponsor for the purpose of raising or soliciting funds for the charity or sponsor before the professional solicitor, federated fundraising agency or sponsor has been issued a charitable solicitations permit" by the director of the Department of Justice and Consumer Services. Pinellas County Code § 42–321(c). Following the parties' motions for summary judgment, the county twice amended the ordinance (Docs. 81 & 88).[12] This order addresses the current version of the ordinance.

The ordinance requires "registration and full public disclosure by persons who solicit contributions for a charitable ... purpose[13] from the public ... in order to prevent deception, fraud, or misrepresentation in the solicitation, use and reporting of contributions." Pinellas County Code § 42–270.[14] The ordinance requires a charitable organization to register with the Department of Justice and Consumer Services (the "department") and requires a permit before soliciting a contribution in Pinellas County. See Pinellas County Code § 42–291.[15] Generally, a permit expires in twelve months. See Pinellas County Code §§ 42–294(b) ("All permits ... shall be valid for 12 months from the date of issuance, except for one-time events.") & 42–294(d) ("A permit that is not renewed under this article shall expire

for purposes of raising and distributing contributions." Pinellas County Code § 42–266.

11. The ordinance defines "professional solicitor" as "any person who, for compensation, performs for a charitable organization or sponsor any service in connection with which contributions are or will be solicited by the compensated person or by any person it employs, procures, or otherwise engages ... as an agent, employee, independent contractor or subcontractor, in connection with the solicitation of contributions for or on behalf of a charitable organization or sponsor." Pinellas County Code § 42–266.

12. Recognizing that application of the ordinance to professional fundraising consultants and commercial co-venturers violates the Constitution, the county removed professional fundraising consultants and commercial co-venturers from the ordinance's coverage. See American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County, 189 F.Supp.2d 1319 (M.D.Fla.2001). Nevertheless, the ordinance continues to apply to charitable organizations.

13. A "charitable purpose" includes "any benevolent, philanthropic, patriotic, educational, humane, scientific, artistic, public health, social welfare or advocacy, environmental conservation, civic, safety, fraternal, historical, athletic, medical, religious or other elee-

mosynary objective." Pinellas County Code § 42–266.

14. The ordinance subjects information obtained through the registration process to Florida's public records law, which generally permits "inspection by any person." Fla. Stat. § 119.01; see Pinellas County Code § 42–279(b).

15. Section 42–291 of the ordinance states:
No charitable organization, sponsor, federated fundraising organization, professional solicitor, or other person, unless otherwise exempted, shall solicit contributions in the county by any means or have funds solicited on its behalf by any other person without first registering and having been issued a charitable solicitations permit by the department under this article.
However, Sections 42–272(b) and 42–272(c) of the ordinance exempt from registration: any solicitation for the relief of any individual specified by name at the time of the solicitation where the solicitor establishes a legal depository account and represents in each case that the entire amount collected ... shall be turned over to the named beneficiary [and] ... any solicitations conducted by schoolchildren or college or university students ... for the purpose of financing extracurricular, social, athletic, artistic, scientific, or cultural programs....

one year from the date of issuance."). Section 42–292 of the ordinance requires filing a sworn application that discloses with respect to the applicant a name and business information; a conviction for theft, fraud, misrepresentation, or violation of any funds solicitation law; a denial, suspension, or revocation of a solicitation permit under the ordinance or under Florida's charitable solicitation law; and both the applicant's mailing and street address and the "federally issued identification number." Pinellas County Code §§ 42–292(a)(1) to 42–292(a)(5).[16] In addition, an applicant must submit any agreement with a federated fundraising organization, professional solicitor, or sponsor; the applicant's registration or exemption statement issued by the state pursuant to Chapter 496, Florida Statutes; and the applicant's tax return (i.e., Internal Revenue Service ("IRS") Form 990 or 990–EZ) for the preceding year or, if exempt from filing a tax return, a "report of results" or an unaudited financial statement for the preceding fiscal year. *See* Pinellas County Code §§ 42–292(a)(6) & 42–292(a)(8) to 42–292(a)(10).[17] Further, Section 42–292(a)(7)

**16.** Section 42–292 of the ordinance states:

(a) *Application required.* Any charitable organization, sponsor, federated fundraising organization, professional solicitor, or person desiring to engage in solicitation of contributions in the county shall file a sworn application with the department, which contains the following information and shall be accompanied by the following documents:

(1) If the applicant is:

a. An individual, the individual shall state his legal name and any aliases;

b. A group, the group shall state its legal identity;

c. A partnership, the partnership shall state its complete name and any fictitious name, and the names of all partners having either direct, managerial, supervisory or advisory responsibilities for the solicitation of charitable contributions, and whether the partnership is general or limited; or

d. A corporation, the corporation shall state its complete name and any fictitious name, the date of its incorporation, evidence that the corporation is in good standing, the names and capacity of all officers, directors, and stockholders having either direct, managerial, supervisory or advisory responsibilities for the solicitation of charitable contributions and, if applicable, the name of the registered corporate agent and the address of the registered office for service of process.

(2) Whether the applicant or any other individual listed pursuant to subsection (a)(1) of this section is registered under this article or any other solicitations statute or ordinance, and if so, the name(s) of the registering agency and the other permit holders.

(3) Whether the applicant or any other individual listed pursuant to subsection (a)(1) of this section has, within the five-year period immediately preceding the date of the application for registration, been convicted of a violation of F.S. ch. 496, this article, or any other federal, state or local ordinance, act or law governing theft, fraud, misrepresentation or the solicitation of funds, and if so, the conviction involved, the date of conviction, and the place of conviction.

(4) Whether the applicant or any other individual listed pursuant to subsection (a)(1) of this section has had a previous permit under this article or registration under F.S. ch. 496 suspended, revoked, or denied, or by court order been required to cease operation, or been fined or otherwise administratively sanctioned, including the date of the actions.

(5) The applicant's mailing address, physical street address, telephone number and the federally issued identification number of the individuals listed pursuant to subsection (a)(1) of this section.

**17.** Section 42–292 of the ordinance further states:

(a) *Application required.* Any charitable organization, sponsor, federated fundraising organization, professional solicitor, or person desiring to engage in solicitation of contributions in the county shall file a sworn application with the department, which contains the following information and shall be accompanied by the following documents:

requires "[a] statement as to whether any of the owners, directors, or officers of the [applicant] ... are related as parent, spouse, child, or sibling to any other directors, officers, or owners of the applicant, or knowingly related to any officer, director, or trustee of any charitable organization or sponsor under contract to the [applicant] ..., or knowingly related to any supplier or vendor providing goods or services to any charitable organization or sponsor under contract to the applicant." Section 42-292(a)(11) requires identification of the purpose of the charitable organization and the method of execution.[18] Finally, the ordinance requires information on each solicitation program, including the name of the solicitation, the manner or method of solicitation, the contemplated receipts and expenses of the solicitation, the proportion of the contribution destined for the "object of the solicitation," and the plan for the distribution of contributions. Pinellas County Code § 42-292(a)(12)(a) to (12)(e).[19]

Pursuant to Section 42-276(c), the director of the department (the "director") promulgated application forms to collect the information ostensibly required by the ordinance.[20] Aside from other informa-

---

... 

(6) If applicable, the applicant's statement of agreement or letter of authorization made with any federated fundraising organization, professional solicitor, or sponsor, together with a copy of such agreement.

... 

(8) A copy of the registration or exemption statement issued under F.S. ch. 496 to the applicant or any other individual listed pursuant to subsection (a)(1) or (a)(2) of this section.

(9) Either a copy of the Internal Revenue Service form 990 and schedule A filed for the preceding financial year, a copy of the Internal Revenue System [sic] form 990-EZ filed for the preceding financial year, a copy of the Internal Revenue Service Form 1120-T filed for the preceding financial year, or proof of an exemption from filing any of the above forms. Any organization exempt from filing any of the IRS forms shall file a report of results on a form provided by the department or an unaudited financial statement for the preceding financial year. A newly formed organization shall file an itemized budget certified by a senior officer.

(10) A sworn statement attesting to the veracity and accuracy of the information provided in the application.

18. Section 42-292(a)(11) states:

(11) The application shall also contain the following information about the charitable organization:

a. The purpose or work of the organization; and

b. The manner in which the purpose or work of the organization is carried out.

19. Section 42-292(a)(12) states:

(12) The application shall also contain the following information regarding each activity involving solicitation:

a. The name of the solicitation;

b. The manner or method of solicitation;

c. The contemplated receipts and expenses of the solicitation;

d. The proportion of the contribution which will go toward the object of the solicitation; [and]

e. The distribution plan for collected contributions.

Section 42-295(a)(1), Pinellas County Code, requires a permit holder to maintain financial records "whereby all contributions and all disbursements are clearly entered" and to make the records "available ... to the code enforcement officers for inspection and copying."

Although not required by the ordinance, the department uses the reported financial information to generate a percentage of contributions each registered charity disburses for the charitable cause (Docs. 44, Ex. 3 & 62, Ex. 3). *See* http://pubgis.co.pinellas.fl.us/consumer/checkcharity.cfm (last visited Apr. 7, 2004).

20. Section 42-276(c) of the ordinance states that the "director of the department of justice and consumer services shall promulgate the forms deemed necessary to carry out his or her responsibilities."

The department has an application form for new permits, the "Charitable Solicitation

tion, the "Charitable Solicitation New Permit Application," required for a new permit, requests the name, title, address, telephone and fax number, date of birth, and state and number of the driver's license of (1) a contact; (2) the applicant's chief elected, executive, or operating officer; (3) the individual "managing the solicitation described in [the] application;" (4) the applicant's treasurer or individual "with control of financial records;" and (5) the manager of any telephone room either in or operating into Pinellas County. In addition, the new permit application form requests the location for the planned solicitation; the method of solicitation; the "purpose or work of the organization benefitting from the solicitation" and how the work is "carried out;" and whether the applicant previously registered with the county and whether the applicant registered with the state. Further, the new permit application form requires disclosure of any "professional assistance;" the amount and method of compensation provided to any "professional" or other third party providing assistance; the projected contributions and gross revenues for the coming year either from Pinellas County residents or "[b]ased on ... [s]tate, or [n]ational [a]ccounting;" the projected cost of program services; the anticipated management and general expenses, separated into twenty-five categories;[21] the fundraising expenses; the compensation of "officers, directors, etc.;" the "net assets or fund balances" at both the beginning and the end of the year; and whether any director, supervisor, manager, or "person with authority to receive and/or disburse solicitation income [has] ever been employed by or a member of another organization registered with Pinellas County for solicitation." In addition, the new permit application form requests whether the "applicant or any manager, director, supervisor, advisor, or other person with similar responsibilities and/or responsibility over income and distribution of income" (1) in the preceding ten years has been convicted of a violation of either the ordinance, the state charitable solicitation statute, or any other federal, state, or local law governing theft, fraud, misrepresentation, or the solicitation of funds and (2) in the preceding ten years has had a solicitation permit issued under either the ordinance or the state statute "suspended, revoked, or by court order [has] been required to cease operation or fined or otherwise sanctioned." Finally, the new permit application form requests whether any "owner, director, officer, supervisor, manager, or employee" of the applicant is a parent, spouse, child, or sibling of (1) any other owner, director, officer, supervisor, manager, or employee of the applicant or (2) any director, officer, supervisor, manager, or employee of any professional as-

New Permit Application;" for timely permit renewals, the "Charitable Solicitation Renewal Application;" and for late permit renewals, the "Charitable Solicitation Late Renewal Application." The application forms are available from the county's website at http://www.pinellascounty.org/consumer/charity_ordinance.htm. Despite subsequent amendment of the ordinance, the department continues to use application forms which, at the latest, became effective on October 1, 2002. *See* http://www.pinellascounty.org/consumer/charity_ordinance.htm (last visited Apr. 6, 2004).

21. The new permit application form requests an itemization of expenses for accounting services, advertising and publicity, commissions, costumes and uniforms, decorations and favors, entertainers and musicians, equipment, building rental, food, postage, printing, prizes, professional fees (for example, for a solicitor or co-venturer), royalties, salaries and wages, security services, insurance, labor and services, legal fees, utilities, storage costs, license and permit fees, telephone and fax, transportation, and any "other" purpose.

sistance firm "involved in a current services contract with the applicant."

The new permit application form requires attachment of a "registration or exemption acknowledgment" for the state's charitable solicitation registration requirements (or attachment of the state application if still pending); the applicant's tax return for the preceding year or, if exempt from filing a tax return, an "itemized budget showing anticipated income and expenses;" any contract between the applicant and a professional solicitor, federated fundraiser, or commercial co-venturer; a list of any other state or agency with which the applicant is registered; proof of tax exemption; a list of the name, title, address, birth date, and telephone number of the applicant's officers and directors; "evidence of any fictitious name registration;" the wording imprinted on any "placed or installed devices, canisters, or honor receptacles;" the "wording of a verbal solicitation(s), including any telephone 'pitch', and any written or printed material(s) used in solicitation;" verification of incorporation; and the applicant's internet address.

Section 42–292(b) of the ordinance authorizes the board of county commissioners to set and charge an application fee. "Calculation of the appropriate fee shall be determined by adding the total of direct public support, indirect public support, and net proceeds from the sale of goods and fundraising events in Pinellas County as reported on the organization's Internal Revenue Service form." Pinellas County Code § 42–292(b).[22] According to the application forms, the application fee ranges from $25 to $300 and depends on the gross contributions received or generated from Pinellas County residents or, if unavailable, from state or national gross contributions, during the past fiscal year.[23] For new organizations, the county calculates the application fee based on an "itemized budget for the coming year."

An incomplete application requires notification of the applicant by a code enforcement officer,[24] after which the applicant receives fifteen days to complete the application. Pinellas County Code § 42–292(c).[25] Failure by the applicant to respond within thirty days to a request for completion of the application results in denial of the application. Pinellas County Code § 42–292(c) ("Failure to respond within 30 days to a request for information necessary to complete the application shall result in a denial of the application."). The code enforcement officer has thirty days from the application's "proper filing" to grant or renew a charitable solicitation

---

**22.** In addition, "the board of county commissioners may assess a separate fee for one-time events for which the purpose is raising funds for a charitable organization." Pinellas County Code § 42–292(b).

**23.** Gross contributions of less than $25,000 require payment of a $25 fee; gross contributions of $25,000 or greater but less than $100,000 require payment of a $75 fee; gross contributions of $100,000 or greater but less than $200,000 require payment of a $120 fee; gross contributions of $200,000 or greater but less than $500,000 require payment of a $150 fee; gross contributions of $500,000 or greater but less than $1,000,000 require payment of a $200 fee; gross contributions of $1,000,000 but less than $10,000,000 require payment of a $250 fee; and gross contributions of $10,000,000 or greater require payment of a $300 fee.

**24.** Including the director, the department has seven code enforcement officers (Doc. 44, Ex. 1).

**25.** Section 42–292(c) of the ordinance states:
If the application for a charitable solicitations permit is not properly completed, the code enforcement officer shall notify in writing the person designated for service in the application. The applicant then has 15 days from the date of such notice to properly complete the application.

permit. Pinellas County Code § 42–293(a)(1) ("The code enforcement officer shall grant a new or renewal charitable solicitations permit within 30 days from the date of its proper filing.").[26] Otherwise, the director must mail a notice of intent to deny a permit within thirty days from the application's filing. Pinellas County Code § 42–293(a)(2) ("The director or his or her designee shall mail a notice of intent to deny a charitable solicitations permit within 30 days from the date of its filing."). If the director bases the notice of intent to deny on deficiencies in the application, the director "shall" deny a permit if the applicant fails to correct the deficiencies listed in the notice of intent to deny within fifteen days. Pinellas County Code § 42–293(a)(3) ("The director shall send a notice of denial based on any of the grounds set forth in subsection (c) of this section, or for failure to correct within 15 days any of the deficiencies contained in the notice of intent to deny as set forth in subsection (a)(2) of this section."). An applicant who receives a permit denial "may request a hearing before the director within 15 days ... [and the] director shall set a date for the requested hearing and decide whether to maintain the denial within fifteen (15) days of receipt of the request for hearing." Pinellas County Code § 42–293(a)(4). Any decision by the director "may be reviewed as a matter of right by the circuit court upon the filing of an appropriate pleading by an aggrieved party." Pinellas County Code § 42–278.

The director "shall" deny a permit if (1) in the three years preceding the application, the applicant was convicted of theft, fraud, misrepresentation, or of violating a fund solicitation law, Pinellas County Code § 42–293(c)(1); (2) in the three years preceding the application, the applicant had a permit revoked for a violation of either the ordinance or the state charitable solicitation law, Pinellas County Code § 42–293(c)(2); (3) in the two years preceding the application, the applicant had a permit suspended twice, Pinellas County Code § 42–293(c)(3); (4) the application contains "material false information," Pinellas County Code § 42–293(c)(4); or (5) the application omits "material information." Pinellas County Code § 42–293(c)(5).[27]

The "director or designee may deny, suspend or revoke the charitable solicitations permit of any person for any violation of [the ordinance].... The director or designee shall notify the permit holder in writing of his or her basis for the decision." Pinellas County Code § 42–276(e). For violations of provisions other than those detailing the application and registration requirements, the ordinance grants the permit holder fifteen days from notification from the county to correct the viola-

---

**26.** Although the county insists that if the department reaches no permitting decision before expiration of thirty days "the application will be granted," neither the ordinance nor any evidence supports the county's position.

**27.** Section 42–293(c) of the ordinance states:

(c) *Denial of permit.* The director or designee shall deny a charitable solicitations permit on the basis of any one of the following grounds:

(1) An applicant has been convicted of a violation of F.S. ch. 496, this article, or any other federal, state or local ordinance, act or law governing theft, fraud, misrepresentation, or the solicitation of funds within three years of the latest application.

(2) An applicant has had a registration issued under F.S. ch. 496 or a permit issued under this article revoked within three years of the latest application.

(3) An applicant has had a registration issued under F.S. ch. 496 or a permit issued under this article suspended twice within two years prior to the pending application.

(4) An applicant has submitted an application which contains material false information.

(5) An applicant has submitted an application which omits material information.

tion. Pinellas County Code § 42–296(a). Failure to correct the violation within fifteen days results in the permit's suspension for one year or revocation for a minimum of three years. Pinellas County Code §§ 42–296(b), 42–296(g), & 42–296(h). However, a permit holder may request a hearing with the director, which hearing must be held within thirty days after the notice of violation. Pinellas County Code § 42–296(c). Within fifteen days following the hearing, the director must decide whether to maintain the suspension or revocation. Pinellas County Code § 42–296(d). At the hearing, "the code enforcement officer shall have the burden to show competent and substantial evidence to support the decision to issue a notice of the permit holder's violation, based on the information available to the code enforcement officer at the time of his or her decision." Pinellas County Code § 42–296(d). Pending an appeal, the permit holder need not surrender the permit, Pinellas County Code § 42–296(e), but the permit holder may not solicit a charitable contribution. Pinellas County Code § 42–327 ("It shall be a violation of this [ordinance] ... for any permit holder to solicit in the county pending final action by the director on a notice of intent to suspend or revoke a charitable solicitations permit.").

"If there is no basis for denial of a charitable solicitations permit pursuant to [Sections 42–293(c)(1) through (c)(5) ] ..., the code enforcement officer shall grant the permit, notify the applicant, and issue the permit to the applicant upon payment of the appropriate annual fee." Pinellas County Code § 42–293(b). According to the ordinance, the "code enforcement officer shall register any person and grant or renew a charitable solicitations permit upon compliance" with the ordinance. Pinellas County Code § 42–276(a). Six months after receipt of a new permit (instead of a permit renewal), the permit holder must submit a "financial statement which shows all contributions and expenses and for what uses all such contributions were or are to be disbursed or distributed." Pinellas County Code § 42–295(b)(1)a.[28] In addition, a permit holder must inform the county of any change to information requested by the ordinance within fifteen days of any change. Pinellas County Code § 42–295(b)(4).[29]

The ordinance authorizes the code enforcement officer to "request, for purposes of inspection and investigation, all financial records of any person which pertain to the solicitation and expenditure of contributions received for a charitable or sponsor purpose." Pinellas County Code § 42–276(d). With probable cause, a code enforcement officer may investigate any suspected violation of the ordinance. Pinellas County Code § 42–276(b). In addition, a violation of the ordinance is punishable both with a civil fine and, pursuant to Section 125.29, Florida Statutes, as a misdemeanor. *See* Pinellas County Code §§ 42–268 & 42–276(f).

A permit holder "may renew the charitable solicitations permit by submitting a

---

**28.** Section 42–295(b)(1)a states:

Whoever is required to submit a new charitable solicitations application as opposed to a renewal application shall, six months from the date of issuance of the permit, submit to the code enforcement officer a financial statement which shows all contributions and expenses and for what uses all such contributions were or are to be disbursed or distributed....

**29.** Section 42–295(b)(4) states:

Whenever the information required by or provided under this division has changed, the permit holder shall, within 15 days of the change, provide the code enforcement officer in writing with the changed information.

renewal application ... and by submitting the financial information required and paying the appropriate fee." Pinellas County Code § 42–294(c). The required financial information consists of the applicant's tax return for the preceding year or, if exempt from filing a tax return, a "report of results on a form provided by the department" or an unaudited financial statement for the preceding fiscal year. Pinellas County Code § 42–295(b)(1)b.[30] In addition, the renewal applicant must explain "for what uses all ... contributions were or are to be disbursed or distributed." Pinellas County Code § 42–295(b)(1)b. According to the county's "Charitable Solicitation Renewal Application," a renewal application "must be received ... thirty (30) days before the current permit expires." Permit renewal requires the same fee as a new permit application, but a late renewal application (i.e., a renewal application submitted after expiration of the current permit) subjects the applicant to an additional $10 fee for every thirty days beyond the current permit's expiration.[31] In part, the renewal application form requests information also requested by the new permit application, including the name, title, address, telephone and fax numbers, date of birth, and state and number of the driver's license of both a contact and the renewal applicant's chief elected, executive, or operating officer. Further, the renewal application form requires attachment of "[e]xamples of current printed material(s) used in solicitation, and the wording of the verbal solicitation or 'tele-

phone pitch" ' and of any agreement "between solicitation income beneficiaries and affiliated fundraisers." Finally, the applicant's IRS Form 990 or 990–EZ or equivalent IRS financial filing for the preceding year must accompany the renewal application form or, if exempt from filing, the renewal applicant must disclose the total gross revenue; contributions; cost of program services; itemized expenses (divided into the same twenty-five categories required by the new permit application); fundraising expenses; compensation of "officers, directors, etc.;" and net assets or fund balances at both the beginning and the end of the year. Failure to comply with the ordinance's reporting requirements requires denial of a renewal request. Pinellas County Code § 42–294(c)(2).

Failure by a permit holder to apply for renewal before the current permit's expiration date requires filing of a "Late Renewal Application." Pinellas County Code § 42–294(c)(1). The department's "Late Renewal Application" requests essentially the same information requested by the new permit application form.

### B. The Florida Solicitation of Contributions Act

Chapter 496, Florida Statutes, regulates the solicitation of charitable contributions within Florida and establishes a registration process. The state statute's intent and purpose mirror those of the county ordinance. Fla. Stat. § 496.402. The statute requires the development of a public

---

**30.** Section 42–295(b)(1)b states:

Whoever is required to submit a renewal application shall, 12 months from the date of issuance of the second or subsequent permit, submit to the code enforcement officer the documents listed in section 42–292(a)(9) of this code....

Similarly, "[e]ach permit holder whose solicitation is a single, discreet solicitation within a year shall, within 30 days after termination of the permitted solicitation, submit to

the code enforcement officer the documents listed in section 42–292(a)(9) of this code and for what uses all such contributions were or are to be disbursed or distributed." Pinellas County Code § 42–295(b)(3).

**31.** The ordinance authorizes charging "a late fee as set by resolution of the board of county commissioners." Pinellas County Code § 42–294(c)(1).

information program to distribute information that furthers the purposes of the statute. Fla. Stat. 496.423. Before any solicitation in Florida, the state requires a charitable organization to submit to the Florida Department of Agriculture and Consumer Services a sworn registration statement disclosing the applicant's name and purpose; the purpose for which the solicited funds will be used; the name of the person in charge of the solicitation; whether the applicant is authorized by another state to solicit contributions; whether the applicant or any officer, director, trustee, or "principal salaried executive personnel" has been either enjoined in any jurisdiction from soliciting contributions or found to have engaged in an unlawful practice in the solicitation of contributions or the administration of charitable assets; whether the applicant has had authorization to solicit denied, suspended, or revoked and the reason for any denial, suspension, or revocation; whether the applicant has settled an investigation into violation of a charitable solicitation statute by entering into an "assurance of voluntary compliance;" whether in the last ten years the applicant or any officer, director, trustee, or employee has been convicted of a felony or of a crime involving fraud, theft, larceny, embezzlement, fraudulent conversion, misappropriation of property, or the conduct of a charitable solicitation and the details of any such conviction; whether the applicant or an officer, director, trustee, or employee has been enjoined from violating any charitable solicitation law and the details of any such injunction; information about any professional solicitor, professional fundraising consultant, or commercial co-venturer that will act on behalf of the applicant, including the "specific terms of the arrangements for salaries, bonuses, commissions, expenses, or other remunerations to be paid the fundraising consultant and professional solicitor;" and details of the applicant's formation and tax-exempt status, accompanied by any federal tax exemption determination letter. See Fla. Stat. §§ 496.405(1)(a) to 496.405(2)(f). Further, the registration statement must contain, subject to prompt supplementation if a change occurs, the address and telephone number of the applicant and of any office in Florida, or, if the applicant has no office in the state, the name, address, and telephone number of the person having custody of the applicant's financial records; the name and address of each officer, director, trustee, and "principal salaried executive personnel;" the end date of the applicant's fiscal year; a list or description of the applicant's "major program activities;" and the name, address, and telephone number of each individual or officer with "final responsibility for the custody of the contributions and who will be responsible for the final distribution of the contributions." Fla. Stat. § 496.405(2)(g). In addition, the applicant must annually submit a renewal statement. Fla. Stat. § 496.405(1)(a). Along with both the registration and the annual renewal statement, the applicant must submit IRS Form 990 or 990–EZ for the preceding year (a newly formed organization must submit a budget for the current fiscal year) or a "financial report," including a balance sheet; revenue and expenses; any change in the fund balance; the name and address of and the amount received from any professional fundraising consultant, professional solicitor, or commercial co-venturer; and "functional expenses," which include any program, management, fundraising, and general expense. Fla. Stat. §§ 496.405(2)(a) & 496.407(1). The state imposes an annual application fee that ranges from $10 to $400 and depends on the contributions received for the last fiscal year. Fla. Stat. § 496.405(4)(a).

The state imposes separate registration requirements on a professional fundraising

consultant and a professional solicitor. *See* Fla. Stat. §§ 496.409 & 496.410. No charitable organization that aspires to solicit a contribution in Florida may contract with a professional fundraising consultant or professional solicitor not registered with the state. Fla. Stat. § 496.411(5). Among other information, these professionals must disclose details of any familial relationship within the applicant and between the applicant and both any charitable organization under contract with the applicant and "any supplier or vendor providing goods or services to any charitable organization … under contract to the applicant." Fla. Stat. §§ 496.409(2)(d) & 496.410(2)(e). Further, the applicant must submit a copy of any contract with a charitable organization, which contract must disclose the fee paid to the applicant. Fla. Stat. §§ 496.409(4), 496.409(5), & 496.410(7).

The state statute prohibits violation of any registration requirement. For example, the statute prohibits (1) false or misleading information in a registration submission and (2) any misrepresentation or other misleading or fraudulent statement or conduct in connection with a solicitation. *See* Fla. Stat. § 496.415. The statute authorizes the Florida Department of Agriculture and Consumer Services to investigate "any person or organization whenever there is an appearance, either upon complaint or otherwise, that a violation of [the statute] … has been committed or is about to be committed." Fla. Stat. § 496.419(1). Among other remedies, the state may assess a civil penalty, criminally prosecute, refuse to register, and cancel or suspend the registration of any violator. Fla. Stat. §§ 496.417, 496.419(5), & 496.420.

### C. *American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*

The county contends that *American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 32 F.Supp.2d 1308 (M.D.Fla.1998), *aff'd in part*, 221 F.3d 1211 (11th Cir.2000), a challenge to an earlier version of the county's charitable solicitation ordinance, disposes of the charities' current challenge (Doc. 69). The charities respond that (1) an August 3, 2001, order (Doc. 19) in this action rejects any preclusive effect of *American Charities* and (2) *American Charities* involves a challenge by professional fundraising consultants, rather than charities, and presents distinct facts (Doc. 61).

With the exception of American Charities, the parties in the two actions differ. *American Charities* involved a challenge by professional fundraisers and American Charities appeared in the action only as "the assignee of a claim and in its representational capacity of various supporters who engage in professional fundraising." *American Charities*, 32 F.Supp.2d at 1312. Although Judge Kovachevich denied the plaintiffs' First Amendment and Commerce Clause challenges, Judge Kovachevich ruled after only "minimal discovery." 32 F.Supp.2d at 1313. Further, Judge Kovachevich's substantive rulings addressed only the parties' facial challenge and, following remand, addressed the parties' as-applied challenge only under the Fourteenth Amendment Due Process Clause, a challenge not raised in this action. *See American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County*, 189 F.Supp.2d 1319 (M.D.Fla.2001). In addition, *American Charities* remained silent about both the permit application forms promulgated by the director and the ordinance's updating and interim reporting requirements. Finally, the county both amended the ordinance on several occasions since *American Charities'* substantive review and raised the application fee. In short, *American Charities* fails to preclude any issue or

claim raised in this action. *See Pleming v. Universal–Rundle Corp.,* 142 F.3d 1354 (11th Cir.1998).

## II. FIRST AMENDMENT: PRIOR RESTRAINT

■ The charities allege that the ordinance's regulatory scheme is an unconstitutional prior restraint of protected speech because the scheme (1) is unjustified under the circumstances, (2) provides excessive discretion for the director to "delay and censor free speech," and (3) lacks adequate procedural safeguards (Docs. 1 & 43). Specifically, the charities argue that achievement of the ordinance's goal requires no prior restraint because the county (or the state, the United States Department of Justice, the IRS, or the United States Postal Service) can prosecute if any solicitation contains a misrepresentation or other fraudulent communication. Next, the charities argue that although the ordinance purportedly delineates circumstances that require either a denial, suspension, or revocation of a permit, the ordinance is "vague" and permits "highly subjective judgment calls." The charities contend that the "issuance and revocation of permits in . . . [Pinellas] County is a highly subjective affair dependent on differing interpretations regarding what the [o]rdinance and forms require, negotiation with charities and their representatives regarding what the [c]ounty will accept, and the exercise of discretion in deciding when to deny or revoke a permit for failure to satisfy the [c]ounty's requirements." Despite the time limits imposed by the ordinance, the charities contend that in practice months elapse while the applicant and the county negotiate the information required for a permit (Doc. 56). Finally, the charities argue that the ordinance fails to impose the procedural safeguards required by *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), including a reasonable time period for a decision,

authorization of solicitation absent a denial from the county within a prescribed period, prompt judicial resolution of any adverse decision, and abatement of any adverse decision pending judicial review.

In relevant part, the county responds that (1) experience with fraud by purportedly charitable organizations before enactment of the ordinance demonstrates the necessity for the ordinance's regulatory scheme; (2) the director's discretion is "ministerial and bound within the limits of the [o]rdinance;" and (3) the required safeguards flow from *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), rather than from *Freedman,* because "applicants for a license have every incentive to stick it out and see litigation through to its end" (Doc. 69).

The First Amendment protects charitable solicitation. *See Riley v. National Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 789, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988); *Village of Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 632, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Church of Scientology Flag. Serv. Org. v. City of Clearwater,* 2 F.3d 1514, 1543 (11th Cir. 1993). Therefore, because the ordinance grants the county authority to prevent an organization from soliciting a charitable contribution, the ordinance receives First Amendment scrutiny. *See Riley,* 487 U.S. at 801, 108 S.Ct. 2667. Although the ordinance imposes a prior restraint, *see, e.g., American Target Adver., Inc. v. Giani,* 199 F.3d 1241, 1250 (10th Cir.2000) (a law that bars a professional solicitation consultant from assisting with a solicitation before complying with registration requirements "definitionally qualifies as a prior restraint"); *Famine Relief Fund v. West Virginia,* 905 F.2d 747, 753 (4th Cir.1990) (a law imposes a prior restraint if it bars solicitation pending judicial determination

of an administrative denial of permission to solicit), "[p]rior restraints are not unconstitutional per se." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). However, "[a]ny system of prior restraint ... [bears] a heavy presumption against its constitutional validity." *Southeastern Promotions*, 420 U.S. at 558, 95 S.Ct. 1239 (quotations omitted) ("[A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand."); *see Fernandes v. Limmer*, 663 F.2d 619, 628 (5th Cir.1981) ("[G]overnmental authorities may not, except in demanding circumstances, deny access to a public forum in anticipation of consequences that may flow from the contemplated activity.").

*Freedman*, which requires comprehensive "procedural safeguards designed to obviate the dangers of a censorship system," 380 U.S. at 58, 85 S.Ct. 734, is "inapposite because the licensing at issue here is not subject-matter censorship." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322, 122 S.Ct. 775, 151 L.Ed.2d 783 (2002) ("We have never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in *Freedman.*"); *cf. Teitel Film Corp. v. Cusack*, 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed.2d 966 (1968). The ordinance need not contain the comprehensive safeguards of *Freedman* because the ordinance "does not authorize a licensor to pass judgment on the content of speech: None of the grounds for denying a permit has anything to do with what a speaker might say." *Thomas*, 534 U.S. at 322, 122 S.Ct. 775.

■ Two features of any system that imposes a prior restraint are unconstitutional. *See FW/PBS*, 493 U.S. at 225, 110 S.Ct. 596. First, no system of prior restraint may place " 'unbridled discretion in the hands of a government official or agen-

cy.' " *FW/PBS*, 493 U.S. at 225, 110 S.Ct. 596 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 & 764, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) ("[T]he government ... may not condition ... speech on obtaining a license or permit from a government official in that official's boundless discretion.")); *see Cafe Erotica of Fla., Inc. v. St. Johns*, 360 F.3d 1274, 1283 (11th Cir.2004). Second, "a prior restraint that fails to place limits on the time within which the decision maker must issue the license is impermissible." *FW/PBS*, 493 U.S. at 226, 110 S.Ct. 596; see *Cafe Erotica*, 360 F.3d at 1282.

### A. The Director's Discretion

The Supreme Court has "condemn[ed] systems in which the exercise of ... authority [by a public official to deny use of a forum in advance of actual expression] was not bounded by precise and clear standards." *Southeastern Promotions*, 420 U.S. at 553, 95 S.Ct. 1239 ("[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use."). "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (quotations omitted) ("The reasoning is simple: If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted" (quotations and citations omitted)). "Standards provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech."

*City of Lakewood,* 486 U.S. at 758, 108 S.Ct. 2138.

### 1. The County Ordinance

██ Although the county may require periodic licensing, neutral criteria must exist to "insure that the licensing decision is not based on the content or viewpoint of the speech being considered." *City of Lakewood,* 486 U.S. at 760, 108 S.Ct. 2138. Despite the charities' contrary contention, the ordinance contains sufficiently precise and clear neutral standards that govern whether to deny, suspend, or revoke a permit. The director must grant a permit unless (1) the applicant fails to "properly complete" the application form, Pinellas County Code § 42–292(c); (2) in the preceding three years, the applicant has been convicted of theft, fraud, misrepresentation, or violation of any fund solicitation law, Pinellas County Code § 42–293(c)(1); (3) in the preceding three years, the applicant has had a permit revoked for violation of either the ordinance or the state charitable solicitation law, Pinellas County Code § 42–293(c)(2); (4) in the preceding two years, the applicant has had a permit suspended twice, Pinellas County Code § 42–293(c)(3); (5) the application contains "material false information," Pinellas County Code § 42–293(c)(4); or (6) the application omits "material information," Pinellas County Code § 42–293(c)(5). Further, the director "may" deny, suspend, or revoke a permit for "any violation of [the ordinance]." Pinellas County Code § 42–276(e). None of these provisions grants a county official unbridled and unconstitutional discretion to restrain a charity's speech. *See Church of Scientology,* 2 F.3d at 1548 ("It is a purely ministerial function to determine whether a registration form provides a statement of the nature and identity of the organization, its tax-exempt status, other Florida cities in which it is registered, and the criminal histories of its officers and solicitors.... Thus, the clerk has no latitude to engage in invidious discrimination against disfavored speakers or religions."); *International Soc'y for Krishna Consciousness of Houston, Inc. v. City of Houston,* 689 F.2d 541, 547 (5th Cir. 1982) ("There is no provision, explicit or implicit, for the exercise of discretion. The information sought is purely objective—names, addresses, telephone numbers, and related matters of an identifying nature.... The regulatory scheme is based on providing the general public with facts identifying the solicitors and describing the solicitation."); *Fernandes,* 663 F.2d at 629 (an ordinance may require denial of a solicitation permit if the permit application either omits information or contains false statements); *Holy Spirit Ass'n for the Unification of World Christianity v. Hodge,* 582 F.Supp. 592, 597–98 (N.D.Tex. 1984) (finding constitutional the denial of a solicitation permit either if "[o]ne or more of the statements made in the application are not true" or if the applicant "has made ... false statements or misrepresentations in the application"); *cf. City of Lakewood,* 486 U.S. at 769, 108 S.Ct. 2138. *But see Hodge,* 582 F.Supp. at 597–98 (finding unconstitutional the denial of a permit if the applicant either "has been convicted ... of a crime involving moral turpitude" or has "violated any of the terms of the permit or [the ordinance]" because "[d]enying a permit for prior misconduct is impermissible unless the government can show that the speech prohibited will surely result in direct, immediate, and irreparable damage").

### 2. The Application Forms

██ In contrast to the ordinance provisions that govern the denial, suspension, and revocation of a permit, Section 42–276(c) of the ordinance, which grants the director authority to "promulgate the forms deemed necessary to carry out his or her responsibilities," insufficiently limits the director's discretion. Section 42–276(c) enables the director's promulgation

of application forms that request an expansive and forbidding quantity of information not authorized by the ordinance and, consequently, lacks the precise and clear standards compelled by the First Amendment. *See American Target,* 199 F.3d at 1251 n. 3 & 1252 (a solicitation ordinance that grants the decisionmaker authority to request "any additional information" confers "unconstitutional discretion . . . because it presumes that [the decisionmaker] . . . will use her blanket authority to request additional information only in good faith and

consistent with implicit standards"); *cf. City of Lakewood,* 486 U.S. at 770, 108 S.Ct. 2138 (limits imposed on the decisionmaker's discretion must "be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice").

The insufficient limit on the director's discretion enables the director's promulgation of application forms that require information and documents not specified in the ordinance.[32] Because the ordinance

**32.** Without the ordinance's authorization, the permit application forms request (1) the date of birth and the state and number of the driver's license of a contact; of the applicant's chief elected, executive, or operating officer; of the individual managing the solicitation in the county; of the treasurer or other individual with control of the applicant's financial records; and of the manager of any telephone room operating either in or into Pinellas County, *cf.* Pinellas County Code § 42–292(a)(5); (2) the address and telephone and fax number of a contact; of the applicant's chief elected, executive, or operating officer; of the individual managing the solicitation in the county; of the treasurer or other individual with control of the applicant's financial records; and of the manager of any telephone room operating either in or into Pinellas County, *cf.* Pinellas County Code § 42–292(a)(5); (3) whether the applicant will use a commercial co-venturer or professional fundraising consultant and the details of any agreement with the co-venturer or professional fundraising consultant, *cf.* Pinellas County Code § 42–292(a)(6); (4) projected contributions and gross revenue from solicitations outside Pinellas County, *cf.* Pinellas County Code § 42–292(a)(12)c; (5) anticipated management and general expenses (itemized for twenty-five categories), *cf.* Pinellas County Code § 42–292(a)(12)c; (6) fundraising expenses from solicitations outside Pinellas County, *cf.* Pinellas County Code § 42–292(a)(12)c; (7) whether the applicant's director, supervisor, manager, or "person with authority to receive and/or disburse solicitation income [has] ever been employed by or a member of another organization registered with Pinellas County for solicitation;" (8) whether anyone associated with the applicant,

if the applicant is a partnership, any partner "having either direct, managerial, supervisory or advisory responsibilities for the solicitation of charitable contributions," or if the applicant is a corporation, any "officers, directors, and stockholders having either direct, managerial, supervisory or advisory responsibilities for the solicitation of charitable contributions and, if applicable, . . . the registered corporate agent," has a conviction older than five years for violation of either the ordinance, the state solicitation statute, or any other federal, state, or local law governing theft, fraud, misrepresentation, or the solicitation of funds, *cf.* Pinellas County Code § 42–292(a)(3); (9) whether anyone associated with the applicant, if the applicant is a partnership, any partner "having either direct, managerial, supervisory or advisory responsibilities for the solicitation of charitable contributions," or if the applicant is a corporation, any "officers, directors, and stockholders having either direct, managerial, supervisory or advisory responsibilities for the solicitation of charitable contributions and, if applicable, . . . the registered corporate agent," has had a permit issued under the ordinance or the state solicitation statute "suspended, revoked, or by court order been required to cease operation or fined or otherwise sanctioned," Pinellas County Code § 42–292(a)(4); and (10) whether anyone associated with the applicant other than an owner, director, or officer of the applicant is a parent, spouse, child, or sibling of any other director, officer, or owner of the applicant or is "knowingly related" to any officer, director, or trustee of "any charitable organization or sponsor under contract" with the applicant or is "knowingly related to any supplier or vendor providing goods or services to any charitable organization or sponsor under contract

authorizes neither issuance of a permit absent a completed application form nor solicitation absent a permit, the ordinance, in violation of the First Amendment, enables both the denial of a permit application and the consequent restraint of speech based on an applicant's failure to provide information requested by the director's application forms but not enumerated in the ordinance. *See* Pinellas County Code § 42–293(a)(3). In other words, the ordinance impermissibly allows denial of a permit for failure to comply with requirements uniquely formulated by the director and, consequently, confers to the director unbridled and unconstitutional discretion to enforce a prior restraint and to silence protected speech.

### B. Time Limits

 "[A] prior restraint that fails to place limits on the time within which the decision maker must issue the license is impermissible." *FW/PBS*, 493 U.S. at 226, 110 S.Ct. 596.[33] Although the ordinance permissibly limits to thirty days the time for the director to grant, renew, or deny a permit, the ordinance precludes solicitation in the absence of a timely decision by the director. Consequently, upon expiration of the thirty-day deadline the applicant remains unauthorized to solicit, even if the applicant receives no permitting decision. *See* Pinellas County Code §§ 42–293(a)(1) & 42–293(a)(2). Although

the county insists that expiration of a pertinent deadline with no action by the department automatically authorizes the applicant's solicitation, neither the ordinance nor the record supports the county's contention. No demonstrable need exists to "depend on the individuals responsible for enforcing the Ordinance to do so in a manner that cures it of constitutional infirmities." *Redner v. Dean*, 29 F.3d 1495, 1501 (11th Cir.1994).

In practice, the ordinance's failure to authorize an applicant's solicitation in the absence of a permit's grant, renewal, or denial by the deadline enables a county official's indefinite and unconstitutional restraint of a charity's solicitation. *See Artistic Entertainment, Inc. v. City of Warner Robins*, 223 F.3d 1306, 1310–11 (11th Cir.2000) (finding violative of the First Amendment a licensing ordinance that "imposes a deadline on the City to consider an adult business license application, [but] … does not guarantee the adult business owner the right to begin expressive activities within a brief, fixed time frame"); *Redner*, 29 F.3d at 1501; *Cafe Erotica/We Dare To Bare/Adult Toys/Great Food/Exit 94, Inc. v. St. Johns*, 143 F.Supp.2d 1331, 1335 (M.D.Fla.2001) ("Although the Ordinance sets out a specific and reasonable time in which the County Administrator must issue a permitting decision, the Ordinance makes no provisions

---

to the applicant," Pinellas County Code § 42–292(a)(7).

In addition, the permit application forms request submission of the following items without express authorization from the ordinance: (1) any contract between the applicant and a commercial co-venturer, *cf.* Pinellas County Code § 42–292(a)(6); (2) a list of the birth date, address, and telephone number of an applicant's officers and directors, *cf.* Pinellas County Code § 42–292(a)(5); and (3) the "wording of a verbal solicitation(s), including any telephone 'pitch', and any written or printed material(s) used in solicitation."

**33.** *FW/PBS* also requires an opportunity for prompt judicial review of the licensing decision. 493 U.S. at 229, 110 S.Ct. 596; *see Cafe Erotica*, 360 F.3d at 1283; *Redner v. Dean*, 29 F.3d 1495, 1500 (11th Cir.1994); *see also Boss Capital, Inc. v. City of Casselberry*, 187 F.3d 1251, 1256 (11th Cir.1999) ("[A]ccess to prompt judicial review is sufficient for licensing decisions."). The ordinance facially satisfies this requirement. *See* Pinellas County Code § 42–278 (any permit decision "may be reviewed as a matter of right by the circuit court upon the filing of an appropriate pleading by an aggrieved party").

for what shall happen if the County Administrator fails to comply with the fourteen day time period set out in the Ordinance."). On its face, Section 42–293(a)(1) "risks the suppression of protected expression for an indefinite time period prior to any action on the part of the decisionmaker or any judicial determination." *Redner,* 29 F.3d at 1501. Accordingly, Section 42–293(a)(1) violates the First Amendment's guarantees.

The ordinance also fails to require the department's response to an incomplete application. Although Section 42–292(c) of the ordinance specifies a deadline for denial of an incomplete application after a request for additional information and Sections 42–293(a)(1) through 42–293(a)(3) provide for grant or denial of a permit following "proper" filing of an application, the ordinance fails both to guide the determination of whether submission of an application constitutes "proper" filing and to require a response to an application not deemed a "proper" filing.[34] In other words, no time constraint requires the department's response to an application the department deems not a "proper" filing. Consequently, the department may avoid the deadline for a decision and indefinitely restrain speech by failing to characterize an application as a "proper" filing. This lack of restraint permitted by the ordinance violates the First Amendment. *See Gospel Missions of Am. v. Bennett,* 951 F.Supp. 1429, 1445 (C.D.Cal.1997) (finding unconstitutional an ordinance without a deadline for approval or denial of an "amended" charitable solicitation permit application because the ordinance enables the government's indefinite restraint of speech); *cf. American Target,* 199 F.3d at 1253 ("The state, by regulation, requires that all initial [charitable solicitation] applications and renewals of registration be processed within ten days of their receipt by the Division of Consumer Protection.").[35]

## III. FIRST AMENDMENT: UNDUE BURDEN

■ The charities complain that the ordinance's registration requirements "are unduly onerous, demanding detailed, extensive, and intrusive information from charitable organizations" that cannot comply "without incurring prohibitive costs" (Doc. 1). Although an ordinance "that requires ... a 'license' for the dissemination of ideas is inherently suspect," *Secretary of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 964 n. 12, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), "[s]oliciting financial support is undoubtedly subject to reasonable regulation." *Village of Schaumburg,* 444 U.S. at 632, 100 S.Ct. 826; *see Cantwell v. Connecticut,* 310 U.S. 296, 306, 60 S.Ct. 900, 84 L.Ed. 1213 ("[A] state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the

---

**34.** The county's code enforcement officers' differing opinions of what information the application forms require illustrates the danger of indefinite speech restraint imposed by the "proper" filing standard adopted by the ordinance (*see* Doc. 58, Exs. 1–3 & 5). In addition, although the department's operating procedures require that all application questions "be answered (no blank spaces)," the county concedes that the department imposes the application forms' requirements with flexibility (Docs. 60 & 71, Ex. 3).

**35.** In all other respects, the ordinance imposes sufficient time limits both for the permitting process and for any appeal initiated by an applicant. *See, e.g., Cafe Erotica,* 360 F.3d at 1283 (an ordinance that provides the decisionmaker thirty days to deny or approve a completed sign application and twenty days to notify the applicant of any deficiency in the application complies with constitutional requirements); *American Target,* 199 F.3d at 1253.

cause which he purports to represent."). However, regulation "must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views or economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Village of Schaumburg,* 444 U.S. at 632, 100 S.Ct. 826. When reviewing an ordinance for compliance with the First Amendment, "the issue is whether the [county] has exercised its power to regulate solicitation in such a manner as not unduly to intrude upon the rights of free speech." *Village of Schaumburg,* 444 U.S. at 633, 100 S.Ct. 826.

■ The First Amendment requires intermediate scrutiny for content-neutral regulation of protected speech because "in most cases [a content-neutral regulation poses] a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. Federal Communications Comm'n,* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (citations omitted). The "principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989); *see Turner Broadcasting,* 512 U.S. at 642, 114 S.Ct. 2445. "A regulation that serves purposes unrelated to the content of expression is deemed neutral even if it has an incidental effect on some speakers or messages but not others." *Ward,* 491 U.S. at 791, 109 S.Ct. 2746 ("Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech" (citations omitted)); *see Turner Broadcasting,* 512 U.S. at 643, 114 S.Ct. 2445 ("As a general rule, . . . laws

that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral."). A measure designed to control the "secondary" effects of speech rather than to "suppress the expression of unpopular views" is content neutral. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *see Artistic Entertainment,* 223 F.3d at 1308.

With the ordinance, the county intends to oversee and to target the potential for abuse of solicitations but not to "regulate speech because of the message it conveys." *Turner Broadcasting,* 512 U.S. at 645, 114 S.Ct. 2445. The ordinance authorizes no content-based review of a charitable solicitation. Any applicant that submits a completed application, falls outside the specified and objective categories of applicants barred from solicitation, and otherwise complies with the ordinance receives a permit. A charity may neither avoid nor mitigate its obligations under the ordinance by changing the content of its solicitation. *See Turner Broadcasting,* 512 U.S. at 644, 114 S.Ct. 2445. Consequently, the ordinance is content neutral and subject to intermediate scrutiny. *See Turner Broadcasting,* 512 U.S. at 661–62, 114 S.Ct. 2445; *Ward,* 491 U.S. at 792, 109 S.Ct. 2746 (a guideline is content neutral if its justification "has nothing to do with content" (quotations omitted)); *see also American Target,* 199 F.3d at 1247.

■ Because the ordinance imposes content-neutral regulation, the county must demonstrate that the ordinance (1) serves a substantial government interest and (2) is narrowly tailored to serve that interest. *See Riley,* 487 U.S. at 792, 108 S.Ct. 2667; *Village of Schaumburg,* 444 U.S. at 636 & 637, 100 S.Ct. 826; *American Target,* 199 F.3d at 1247; *see also Turner Broadcasting,* 512 U.S. at 662 &

664–65, 114 S.Ct. 2445 ("When the Government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply posit the existence of the disease sought to be cured.... It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."); *Church of Scientology*, 2 F.3d at 1547 (the government failed to satisfy its burden of showing "that the required financial, operational and organizational disclosures are narrowly tailored to serve compelling interests").

### A. Substantial Government Interest

Protecting the public from deception, fraud, and misrepresentation represents "a sufficiently substantial interest to justify a narrowly tailored regulation." *Riley*, 487 U.S. at 792, 108 S.Ct. 2667; *see Watchtower Bible and Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 164–65, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002) (finding fraud prevention an "important" government interest that supports "some form of regulation of solicitation activity"); *Village of Schaumburg*, 444 U.S. at 637, 100 S.Ct. 826 (finding fraud prevention a substantial government interest). The ordinance requires public disclosure of information about "persons who solicit contributions for a charitable or sponsor purpose" in Pinellas County to prevent "deception, fraud, or misrepresentation in the solicitation, use and reporting of contributions." Pinellas County Code § 42–270. To accomplish this goal, the ordinance requires detailed disclosure about both the applicant and the solicitation and requires denial of a solicitation permit in specified circumstances that manifest an unacceptable risk of deception, fraud, or misrepresentation. In short, the ordinance serves a substantial government interest.

### B. Narrowly Tailored Regulation

The county must narrowly tailor the ordinance to serve the substantial government interest of preventing deception, fraud, and misrepresentation. *Joseph H. Munson* recognizes that "concerns about unscrupulous professional fundraisers [and] ... fraudulent charities, can and are accommodated directly, through disclosure and registration requirements and penalties for fraudulent conduct." 467 U.S. at 968 n. 16, 104 S.Ct. 2839. *Riley* emphasizes that government "may constitutionally require fundraisers to disclose certain financial information." 487 U.S. at 795, 108 S.Ct. 2667. The "[e]fforts to promote disclosure of the finances of charitable organizations ... may assist in preventing fraud by informing the public of the ways in which their contributions will be employed. Such measures may help make contribution decisions more informed, while leaving to individual choice the decision whether to contribute...." *Village of Schaumburg*, 444 U.S. at 637–38, 100 S.Ct. 826.

A challenged ordinance need not constitute the "least restrictive" or "least intrusive" means of obtaining the legislative objective. *Joseph H. Munson*, 467 U.S. at 961, 104 S.Ct. 2839; *see Turner Broadcasting*, 512 U.S. at 662, 114 S.Ct. 2445; *Ward*, 491 U.S. at 798, 109 S.Ct. 2746. Rather, narrow tailoring requires promotion of "a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 & 801, 109 S.Ct. 2746 (quotations omitted) ("[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case."). However, "this standard does not mean that a ... regulation may burden substantially more speech than is necessary to

further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.... So long as the means chosen are not substantially ·broader than necessary to achieve the government's interest, ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward,* 491 U.S. at 799–800, 109 S.Ct. 2746; *see Turner Broadcasting,* 512 U.S. at 662, 114 S.Ct. 2445 ("Narrow tailoring ... requires ... that the means chosen do not burden substantially more speech than is necessary to further the government's legitimate interests" (quotations omitted)). In other words, some substantial relationship ·must exist between the ordinance and its goal. *See Village of Schaumburg,* 444 U.S. at 638, 100 S.Ct. 826.

The charities contend that the ordinance lacks narrow tailoring because (1) the registration requirements are either "unduly onerous or seek information to which the [c]ounty is not reasonably entitled;" (2) the ordinance duplicates the state's registration requirements and the IRS's filing and disclosure requirements; (3) absent a written complaint ˙or similar alarm, the county neither verifies nor otherwise uses the information submitted by an applicant; (4) the ordinance imposes unnecessarily repetitive updating and interim reporting

requirements; and (5) the county inappropriately bases the application fee on performance indicators (Doc. 43). According to the charities, the "cumulative burden of [the] duplicative and onerous registration and reporting requirements on charities is excessive and not justified by any interest advanced by the [c]ounty" (Doc. 70).[36] Consequently, the charities argue, the ordinance impermissibly burdens free speech guaranteed by the First Amendment.

### 1. The Registration Requirements

The charities assert that reporting information required by the county ordinance imposes an unreasonable burden. In essence, the ordinance requires reporting of both general and financial information about the applicant and the solicitation in the county.

### a. General Information

 Generally, the charities contend that the information required by the ordinance lacks narrow tailoring to prevent deception, fraud, or misrepresentation. The charities argue that rather than requiring detailed and intrusive information, the county could achieve its goal by prosecuting any perpetrator of deception, fraud, or misrepresentation. In addition, the charities specifically attack Section 42-292(a)(7), which section is intended to reveal a potential conflict of interest resulting from a familial relationship between

---

**36.** Public Citizen contends that "[i]f more than even a smattering of local governments followed Pinellas County's lead, Public Citizen not only would struggle under the weight of the mounting filing fees, but ... likely would˙have to hire additional staff whose only function would be to try to keep up with the ever-growing demands of local governments seeking information that either duplicates what is already provided to the IRS or the States, or else is unreasonably onerous to complete and invasive to make public" (Doc. 46).

To reduce the burden on charities, 37 of the 40 states that require registration of a charitable organization, in lieu of each state's registration form, accept the unified registration statement developed by the Multi–State Filers Project and the National Association of State Charity Officials (Doc. 55). According to the charities' expert, the unified registration statement, which combines the participating 37 states' requests, "is shorter and simpler than the [c]ounty form" (Doc. 55).

specified persons associated with either an applicant, a "charitable organization or sponsor under contract" with the applicant, or a "supplier or vendor providing goods or services to any charitable organization or sponsor under contract to the applicant." [37] According to the charities, Section 42–292(a)(7) lacks narrow tailoring because it requires expansive investigation of the relationship between a charity's officers, directors, and certain other employees, their family members, and any outside vendor, including law firms, fundraising consultants, accounting firms, print shops, mail houses, courier services, custodial and janitorial services, office supply stores, and others.[38]

In general, the ordinance's reporting and disclosure provisions are narrowly tailored to achieve the substantial government interest of preventing deception, fraud, and misrepresentation. See American Target, 199 F.3d at 1248 (finding the following registration and disclosure requirements narrowly tailored to serve the government's substantial interest in fraud prevention: the applicant's name, address, telephone number; the name and address of any organization or person controlled by, controlling, or affiliated with the applicant; disclosure of any injunction, judgment, or administrative order against the applicant or any officer, director, manager, operator, or principal of the applicant or their conviction for any crime involving moral turpitude; a copy of any written agreement between a professional solicitor and a charitable organization; and a copy of all agreements to which the applicant is, or proposes to be, a party regarding the use of proceeds); Church of Scientology, 2 F.3d at 1546 & 1548 (finding disclosure requirements similar to those imposed by the ordinance and the following application requirements narrowly tailored to prevent fraud by a charitable organization: the applicant's name; whether the applicant is a natural person, partnership, corporation, or association; reference to any determination of tax-exempt status; and the names of other Florida cities in which the applicant has collected funds for charitable purposes within the past five years); Gospel Missions, 951 F.Supp. at 1450 ("[D]isclosure requirements that specifically relate to the planned charitable solicitation are constitutional...."); Famine Relief Fund, 905 F.2d at 751–52 (finding constitutional a solicitation statute that requires submission of any contract between a charity and a professional fundraiser); Hodge, 582 F.Supp. at 601 (a solicitation ordinance may require an applicant to submit a sworn application that discloses the applicant's identity and address; the names and addresses of all officers, directors, and trustees of the applicant and the name and city of residence of all officers and directors or trustees of any parent organization; the purpose for which the solicitation is performed; the name and address of any person "in charge of conducting the charitable solicitation;" all methods "to be used in conducting the charitable solicitations campaign;" the period of the charitable solicitation; a state-

**37.** The charities also vociferously object to public disclosure of individuals' federal identification number because of the potential for abuse (Doc. 70). However, as American Charities explains, the provision of the ordinance that requires disclosure of a federal identification number does not apply to an individual. See 32 F.Supp.2d at 1316. Thus, although an organization must disclose its federal identification number, an individual need not disclose a social security number. See Ward, 491 U.S. at 794, 109 S.Ct. 2746 ("[P]erfect clarity ... [has] never been required even of regulations that restrict expressive activity.").

**38.** For example, Public Citizen complains that Section 42–292(a)(7) compels investigation of approximately 100 consultants, vendors, and suppliers (Doc. 46).

ment of the "character and extent of the charitable, educational, patriotic or philanthropic work done by the applicant within the city during the last preceding year;" for a corporation, a copy of its charter or articles of incorporation, and for a foreign corporation, a copy of its certificate to do business in the state; and for a charitable organization, proof that contributions to the organization are tax deductible).

Similarly, Section 42–292(a)(7) complies with the narrow tailoring requirements of the First Amendment. *See Famine Relief Fund,* 905 F.2d at 752 (finding constitutional regulation that prohibits conflicts of interest that may affect a charity's operations). Although the section requires investigation and disclosure of a familial relationship between specified individuals associated with the applicant, the section only requires disclosure of a familial relationship with an individual associated with a charitable organization, sponsor, or supplier or vendor of goods or services under contract with the applicant if the applicant has knowledge of such a relationship. *See* Pinellas County Code § 42–292(a)(7). The ordinance imposes no burdensome affirmative duty upon an applicant to investigate familial relationships with individuals associated with another organization.

b. Financial Information

 The charities complain that although detailed financial information for the preceding fiscal year, including revenues, assets, liabilities, and expenses, appears on either IRS Form 990, the "report of results," or the unaudited financial statement required by the ordinance, the ordinance unnecessarily requests the projected receipts and expenses of the solicitation and the proportion of contributions destined for the object of the solicitation. *See* Pinellas County Code §§ 42–292(a)(9) & 42–292(a)(12). The charities assert that the requirement for financial projections exposes "the charity's internal ... strategy" and provides no value to county residents, especially when actual results for the prior year are provided.[39]

The charities also contend that the county's calculation and disclosure of the purported percentage of contributions each registered charity disburses for the charitable cause (the "program services ratio" according to the county's website), an intended barometer of a registered charity's fundraising costs and efficiency, is useless because charities characterize solicitation costs differently, rendering any comparison of little or no value (Doc. 47).[40] Aside from providing little or no value, Public Citizen contends that the program services ratio misleads potential donors because the ratio fails to account for the solicitation base of different charities. Some organizations, for example those that solicit money for the opera, incur lower solicitation costs because they depend on large contri-

---

**39.** For example, although each year Public Citizen budgets for expected revenues and expenses, Public Citizen complains that disclosure of the information, which it characterizes as "highly sensitive" and developed at great expense *with assistance from outside,* paid consultants, "would expose the internal operations of the organization and its solicitation strategy" (Doc. 46). Consequently, Public Citizen adds, its competitors would learn in advance of a major push by Public Citizen to recruit new members from any increase in the projected budget and would adjust their strategy and planning for the year (Doc. 47).

**40.** According to the county's website, the program services ratio, which the department publishes for each registered charity, represents the "percentage of money received which directly supports the program purpose." *See* http://www.pinellas county.org/consumer/charity_ordinance.htm. The department calculates the program services ratio by dividing an applicant's IRS Form 990 entry for the amount spent on "program services" by the entry for "total revenue" (Docs. 44, Ex. & 62, Ex. 3).

butions from a small group of donors. Other organizations, such as Public Citizen, incur higher solicitation costs because they depend on small contributions from a large group of donors. In sum, the charities complain that the program services ratio published by the county fails to account for the difference in solicitation costs that results from factors beyond an organization's control.

. A charitable solicitation law may require disclosure of a charity's financial statements. *See Famine Relief Fund,* 905 F.2d at 752. Disclosure of financial statements "fosters the substantial ... interests in informing the public and preventing fraud without being unduly burdensome." *Famine Relief Fund,* 905 F.2d at 752 ("Financial statements document an organization's activities and are necessary for regulators and interested donors to monitor any potential mismanagement or fraud."). Although IRS Form 990 lists both actual revenue, including an itemization of the amount derived from contributions, and actual expenses, including for program services, management, and fundraising; and separately lists expenses for compensation of officers, directors, and professionals (including lawyers, accountants, and professional fundraisers); supplies; telemarketing fees; and "other" expenses, the ordinance's request for projected receipts and projected expenses of the solicitation and the proportion of the contribution destined for the object of the solicitation in Pinellas County is sufficiently narrowly tailored to comply with the First Amendment (*see* Docs. 46, Ex. A & 48, Ex. A). *See Hodge,* 582 F.Supp. at 601 & 603 (a solicitation ordinance may require both an applicant to submit a sworn application that discloses the "amount of funds proposed to be raised" and a permit holder to "furnish ... after the charitable solicita-

tions campaign has been completed, a detailed report and financial statement showing the amount of funds raised by the charitable solicitations campaign, the amount expended in collecting such funds, including a detailed report of the wages, fees, commissions and expenses paid to any person in connection with such solicitation, and the disposition of the balance of the funds collected by the campaign"); *see also Famine Relief Fund,* 905 F.2d at 751 (finding constitutional a charitable solicitation law that requires disclosure of "the estimated percentage of the money collected which will be applied to the cost of solicitation and administration or how much of the money will be applied directly for the charitable purpose"); *City of Houston,* 689 F.2d at 555 ("[A]n applicant for a [permit] makes only a good faith estimate of [both a projected schedule of expenses and a percentage of the total projected collections which the costs of solicitation will comprise].... It is difficult for this Court to find that such estimates unduly impinge on the plaintiffs' first amendment rights...."). These provisions "assist in preventing fraud by informing the public of the ways in which their contributions will be employed." *Village of Schaumburg,* 444 U.S. at 638, 100 S.Ct. 826; *see Dayton Area Visually Impaired Persons, Inc. v. Fisher,* 70 F.3d 1474, 1485 (6th Cir.1995). The requested information apprises the county of any solicitation of its residents and how its residents' contributions are distributed and enables an informed investigation in the event of a complaint or discrepancy. *See* Pinellas County Code § 42–295; *see also Gospel Missions,* 951 F.Supp. at 1444. In addition, the county may publish the detailed financial information provided by an applicant. *See, e.g., Riley,* 487 U.S. at 800, 108 S.Ct. 2667.[41] According to *Riley,* "[t]his proce-

---

**41.** The ordinance also properly permits the department's inspection of the applicant's fi-

nancial records. *See Gospel Missions,* 951 F.Supp. at 1443 (permitting the government

dure would communicate the desired information to the public without burdening a speaker." 487 U.S. at 800, 108 S.Ct. 2667.

The program services ratio and similar indicators of a charity's efficiency are "poorly suited to accomplishing the [government's] goal of [fraud prevention]" because the ostensible benefit of such ratios relies on "a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud." *Joseph H. Munson*, 467 U.S. at 964 n. 12 & 966–67, 104 S.Ct. 2839. Nevertheless, the county's publication of the purported percentage of contributions destined for the charitable cause has no illicit effect on a charity's speech. Under the ordinance, an applicant's program services ratio bears relevance neither to whether the applicant receives a permit nor to how a permit holder may solicit contributions and, consequently, fails to intrude on any First Amendment right. *Cf. Hodge*, 582 F.Supp. at 601

(an ordinance may not constitutionally request disclosure of "the maximum percentage of funds collected which are to be used to pay ... expenses of solicitation and collection" because "[t]his requirement of a self-imposed limit on expenses is merely another cost-effectiveness evaluation in disguise and an impermissible consideration in issuing a solicitation permit").[42]

## 2. Registration Requirements Duplicated By The State And The IRS

 The charities contend that registration requirements duplicated by the state or the IRS, both of which require public disclosure of submitted information, lack narrow tailoring (Docs. 43, 46, & 56). *See* Fla. Stat. §§ 119.01 & 496.423; 26 C.F.R. §§ 301.6104(d)–1(a) & 301.6104(d)–2. Like the county, the state requires an applicant's IRS Form 990 or 990EZ, IRS Letter of Determination of tax exemption, and verification of incorporation. In addi-

---

to "access ... all books, records and papers, relating to any solicitation and the distribution of *any* contribution received therefrom" "simply allow[s] ... officials to investigate the accuracy of the submitted information and ... are thus a narrowly tailored mechanism for serving the [government's] legitimate interests [in fraud prevention]"); *Hodge*, 582 F.Supp. at 603 (citing *Village of Schaumburg*, 444 U.S. at 637–38, 100 S.Ct. 826) (a solicitation ordinance may require the permit holder to "make available to the [city] ... all books, records and papers whereby the accuracy of the [solicitation] report ... may be investigated").

**42.** The county might consider accompanying publication of the program services ratio with additional explanatory information. *See City of Houston*, 689 F.2d at 557 ("It is not beyond our competence ... to suggest, with deference, that the City of Houston, might consider simplifying Article IV of its Code of Ordinances consistent with maintaining its compelling governmental interest in protecting its citizens from fraud and harassment *too often* found in the solicitation of funds from the public for charitable and religious purposes."). Adding to Public Citizen's example

of how the program services ratio may mislead a potential donor, *Riley* explains that "a charity might choose a particular type of fundraising drive ... expecting to receive a large sum as measured by total dollars rather than the percentage of dollars remitted. Or, a solicitation may be designed to sacrifice short-term gains in order to achieve long-term, collateral, or noncash benefits." 487 U.S. at 791–92, 108 S.Ct. 2667; *see Indiana Voluntary Firemen's Ass'n, Inc. v. Pearson*, 700 F.Supp. 421, 440 (S.D.Ind.1988) ("[W]here the solicitation is combined with the advocacy and *dissemination* of information, the charity reaps a substantial benefit from the act of the solicitation itself."). Alternatively, a smaller or less popular charity may have higher solicitation expenses "due to the difficulty of attracting donors." *Riley*, 487 U.S. at 793, 108 S.Ct. 2667. In short, several legitimate *strategies* or circumstances exist that may significantly affect the program services ratio published by the county, the explanation of which would undoubtedly assist a potential donor and further the ordinance's goal.

tion, both the county and the state require disclosure of any professional solicitor and federated fundraising organization assisting with the solicitation;[43] the contract with and the method of payment of a professional solicitor or federated fundraising organization; whether the charity or any officer, director, or specified employee has a conviction for theft, fraud, or misrepresentation; and whether the charity either has had a solicitation permit suspended or revoked or has faced any other enforcement action in the state. Finally, the ordinance, the state, and the IRS require the applicant's name and contact information, the name of each board member and officer of the applicant, and a description of any program and activity for which the applicant raises funds. Consequently, the charities argue, public disclosure of the state registration and IRS filings already provide any benefit from public disclosure by the county of registration information.[44]

The charities cite no authority, and none otherwise appears, that a local government's solicitation ordinance lacks narrow tailoring because the ordinance requests information available from the state, a federal agency, or any other source. *See, e.g., Feed the Children. Inc. v. Metro Gov't of*

*Nashville and Davidson County,* Case No. 3:01–1484 (M.D.Tenn. Mar. 21, 2002) (noting that the plaintiff failed to demonstrate that both prevention of fraud and public disclosure of information "cannot be significant governmental interests to both state and local governments simultaneously"). Forbidding the county from promulgating a request duplicated by either the state, the IRS, or another government agency would impede the ordinance's legitimate purpose and would require both a potential donor interested in a particular charitable organization and the county investigating a registered charity to retrieve information from disparate and remote sources. In addition, such a rule would require amendment of the ordinance each time either the state or the United States amends its charitable organization reporting requirements or the tax code, respectively, in a pertinent manner.

### 3. The County's Lack Of Verification

■ Next, the charities assert that the ordinance lacks narrow tailoring because the department, in essence, neither verifies nor otherwise uses information submitted by an applicant except in the unlikely event that the department receives a written complaint.[45] Of five department em-

---

**43.** The charities complain that requiring registration under the ordinance of a professional assisting with the solicitation infringes the First Amendment. As an example, the charities explain that although the American Institute for Cancer Research (the "AICR"), a DMA member and an American Charities supporter, has a county solicitation permit, the professional fundraisers with which the AICR contracts for mail and telephone solicitation refuse to register because of the burden and expense imposed by the ordinance. Consequently, the charities add, the AICR cannot solicit in Pinellas County through its professional fundraisers (Doc. 54). Despite this result, the registration requirement for professionals does not offend a charity's First Amendment rights. *See, e.g., American Target,* 199 F.3d 1241.

**44.** The charities explain that the county and its residents can obtain a charitable organization's state registration materials from a toll-free number, the internet, and a free guide published by the state. In addition, a charity's IRS Form 990 is available from either the state, the charity, or other sources, including the internet.

**45.** From 1990 to March, 2002, the county received 31 written complaints about either a charity or a charitable solicitation (Doc. 44, Ex. 1). For the five years preceding March, 2002, the county received no written complaint of either fraud, misrepresentation, or deception in connection with a solicitation or of misuse or conversion of contributions by a charitable organization (Doc. 44, Exs. 3 & 4).

The charities contend that the low number of complaints undermines the necessity for the ordinance's extensive reporting require-

ployees with responsibility for administering the ordinance, only two have full-time responsibility, neither of whom has a background in accounting, law enforcement, or non-profits (Doc. 44, Ex. 1). Upon submission of a permit application, one of the two full-time employees reviews the application, confirms that the application contains all necessary information, and then files the application. The charities contend that based on the cursory application review process, registration is unnecessary and the county can more effectively deter (and punish) deception, fraud, and misrepresentation through enforcement of existing penal laws.

Although *Riley* approves of vigorous enforcement of anti-fraud laws to prevent fundraisers from obtaining money by false pretenses, *Riley* finds detailed financial disclosure an acceptable method of fraud prevention. 487 U.S. at 800, 108 S.Ct. 2667. Accordingly, the county may simultaneously enforce anti-fraud laws and require registration and public disclosure. The department reviews an application, enters certain information in a database publicly accessible over the internet, allows public review of information submitted by an applicant, and investigates any written complaint about a charity filed with the department. The charities cite no authority that requires the department either to verify sworn information provided by an applicant or to employ the information in any manner not currently pursued by the department.

### 4. Updating And Interim Reporting Requirements

 The charities characterize as "onerous and pointless" the requirements that

(1) a permit holder update any information requested by the application within fifteen days of any change and (2) a new permit holder report financial results or re-submit an IRS Form 990 six months after obtaining the permit.[46] *See* Pinellas County Code §§ 42–295(b)(1)a & 42–295(b)(4). The charities contend that updating material information within fifteen days and updating and reporting annually all other information (during the annual permit renewal process) sufficiently promotes the county's goals (Doc. 70). However, narrow tailoring does not require the "least restrictive" means of achieving the government's goal. *Joseph H. Munson*, 467 U.S. at 961, 104 S.Ct. 2839. The updating and interim reporting requirements provide the county with current information about a registered charity and solicitations in the county, enable effective monitoring of solicitors and charitable solicitations, and assist with the prevention of deception, fraud, and misrepresentation in a narrowly tailored and constitutional fashion.

### 5. The Application Fees

 Finally, the charities challenge the application fee scheme and contend it is impermissibly based either on past contributions or, for a new charitable organization, on an "itemized budget for the coming year." Although Section 42–292(b) of the ordinance authorizes assessment of a fee by the board of county commissioners and requires determination of the appropriate fee "by adding the total of direct public support, indirect public support, and net proceeds from the sale of goods and fundraising events in Pinellas County," the ordinance neither provides additional guidance for setting the fee nor otherwise controls or limits the fee amount.[47]

ments. The county responds that the low number of complaints demonstrates the success of the ordinance. Neither side offers conclusive support for its position.

**46.** According to the charities' expert, Utah is the only other jurisdiction with a comparable six-month interim reporting requirement (Doc. 55).

**47.** Although the department's permit applica-

The charities complain that, in effect, the county impermissibly bases the fee for an established charitable organization on national contributions because the charities typically do not track contributions by county. The charities explain that tracking contributions from Pinellas County is "impracticable" and would require an employee "to take substantial time out from his or her other responsibilities to conduct a special and quite complicated search for Pinellas County zip codes" (Docs. 47, 48, & 56). The county responds that the ordinance's fee structure is a "fair appropriation of the cost of benefits supplied ... [and] does not ... provide the [c]ounty ... with a profit. In fact, the [c]ounty loses money on [the][o]rdinance" (Doc. 60). However, the county offers no supporting evidence and instead relies on conclusory statements, findings unrelated to the ordinance by courts in other jurisdictions, and *American Charities.*

"[F]ees that serve not as revenue taxes, but rather as means to meet the expenses incident to the administration of a regulation and to the maintenance of public order in the matter are constitutionally permissible." *National Awareness Found. v. Abrams,* 50 F.3d 1159, 1165 (2d Cir.1995) (citing *Murdock v. Pennsylvania,* 319 U.S. 105, 113–14, 63 S.Ct. 870, 87 L.Ed. 1292 (1943)); *see American Target,* 199 F.3d at 1249 (finding a fee that "does no more that defray reasonable administra-

tion costs" narrowly tailored to prevent fraud); *Fernandes,* 663 F.2d at 633 ("A licensing fee to be used in defraying administrative costs is permissible, but only to the extent that the fees are necessary" (citation omitted)). Because the expense associated with monitoring a charity varies according to the charity's size and public contribution, a sliding scale fee, such as the county's, that depends on the amount of contributions, whether local or national, and defrays the cost of administration and enforcement of a charitable solicitation ordinance qualifies as a user fee and complies with constitutional requirements. *See Center for Auto Safety, Inc. v. Athey,* 37 F.3d 139, 143 (4th Cir. 1994). Although the fee structure developed under the ordinance neither grants the director discretion in imposing the appropriate fee, permits a content-based fee assessment, nor otherwise differs in any substantial respect from the fee in *Center for Auto Safety,* the county demonstrates no link between the current fees and the cost of administering and enforcing the ordinance.[48] *See Fernandes,* 663 F.2d at 633 n. 11 ("D/FW has not offered any support for its contention that the $6.00 fee is needed to defray the costs of operating the permit system."); *Gospel Missions,* 951 F.Supp. at 1447 ("[T]he City defendants have not demonstrated a link between the fee ... and the costs of the licensing process. Consequently, [the fee]

---

tion forms identify the fee amounts, the forms contain no explanation of how the county board of commissioners sets the applicable fees.

**48.** Although the county submits no pertinent evidence, the county's March 22, 2002, response to interrogatories, filed by the charities in support of summary judgment, states that "the total estimated salary, with benefits," for enforcement of the ordinance is $140,136 and the "cost of office supplies and office equipment" is approximately $9,400 (or a total cost of $149,536) (Doc. 44, Ex. 1). The

interrogatory response states that for 2001, the department collected only $69,550 from permit, renewal, and late fees. However, following the interrogatory response the board of county commissioners raised the pertinent fees from $20, $60, $90, and $120 to $25, $75, $120, $150, $200, $250, and $300. Although more than doubling the fee for certain charities, the county offers no evidence that the amount collected annually since the fee increase continues to not exceed the county's annual cost of administering and enforcing the ordinance.

is unconstitutional on its face."); *Hodge,* 582 F.Supp. at 604 ("[T]he City of Amarillo has not demonstrated a link between the fee and the costs of the licensing process . . . ."); *cf. Center for Auto Safety,* 37 F.3d at 145 (finding that the fees imposed by the state "are calibrated to approximate the costs of administering the [charitable solicitation] [s]tatute, and the revenues raised by the fees do not exceed these costs"). Further, because *American Charities* reviews the previous, lower fee range, Judge Kovachevich's conclusion of "no evidence that the fees collected through registration exceeded the costs the [c]ounty incurs in administering and enforcing the [o]rdinance" fails to save the current fees assessed by the department. 32 F.Supp.2d at 1318 & 1324. In short, neither the ordinance nor the record demonstrates either (1) that the board of county commissioners sets fees only for recovering or defraying the cost of the ordinance's administration and enforcement or (2) that the current fees generate revenue below the cost of the ordinance's administration and enforcement. In the absence of evidence of a link between the fees and the cost of the ordinance's administration and enforcement, assessment of the current fees violates the First Amendment.

## IV. THE COMMERCE CLAUSE

▌ The charities' third claim alleges that the ordinance "impose[s] a burden on interstate commerce" that is "clearly excessive in relation to [the registration requirements'] putative benefits" (Doc. 1). Specifically, the charities contend that the categories, amount, and redundancy of information requested by the ordinance, the filing fee, and the updating and interim reporting requirements exact "a toll that is excessive in relation to" the county's goal of preventing deception, fraud, and misrepresentation (Doc. 43). Consequently,

the charities argue, the ordinance violates Article I's Commerce Clause.

Pursuant to the Commerce Clause, Congress may regulate commerce "among the several States." U.S. Const. Art. I, § 8, cl. 3. The Commerce Clause prohibits state regulation that unduly burdens interstate commerce. *See General Motors Corp. v. Tracy,* 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997); *see also Oregon Waste Sys., Inc. v. Department of Environmental Quality of Oregon,* 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). However, the Commerce Clause does not prohibit every state restriction on commerce. *See Kassel v. Consolidated Freightways Corp. of Del.,* 450 U.S. 662, 669–70, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981). Absent conflicting federal law, a local government may regulate a matter of legitimate local concern that may affect or even regulate interstate commerce. *See Kassel,* 450 U.S. at 669, 101 S.Ct. 1309.

The charities' Commerce Clause challenge first requires a determination of whether the ordinance, on its face or in effect, either "regulates evenhandedly with only 'incidental' effects on" or "discriminates against" interstate commerce. *Oregon Waste Systems,* 511 U.S. at 99, 114 S.Ct. 1345; *see American Target,* 199 F.3d at 1254. Discrimination against interstate commerce requires "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems,* 511 U.S. at 99, 114 S.Ct. 1345. The ordinance imposes no differential treatment of an instate and an out-of-state organization and a charity's status as an out-of-state organization holds no relevance to the ordinance's application. Instead, a charity's status as a charitable organization seeking to solicit a contribution in Pinellas County triggers the ordinance's registration and reporting requirements. Nevertheless,

because the ordinance applies to any charitable organization that seeks to solicit a contribution in Pinellas County, including out-of-state organizations, the ordinance necessarily burdens interstate commerce. However, any burden is minimal. *See American Target,* 199 F.3d at 1254. Consequently, the ordinance effects no discrimination against interstate commerce and, instead, regulates evenhandedly with only an incidental effect on interstate commerce.

 An ordinance that regulates evenhandedly among in-state and out-of-state organizations and imposes only an incidental effect on interstate commerce violates no Commerce Clause protection if (1) the ordinance serves a legitimate interest and (2) the burden on interstate commerce is not "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970); *see Oregon Waste Systems,* 511 U.S. at 99, 114 S.Ct. 1345. The charities bear the burden of proving the ordinance's excessiveness. *See American Target,* 199 F.3d at 1254; *see also Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) ("The burden to show discrimination rests on the party challenging the validity of the statute . . . .").

### A. The Ordinance Serves A Legitimate Interest

 As explained earlier, the prevention of deception, fraud, and misrepresentation represents a legitimate interest. *See Riley,* 487 U.S. at 792, 108 S.Ct. 2667; *Village of Schaumburg,* 444 U.S. at 637, 100 S.Ct. 826. The county properly believes that a charitable solicitation presents a danger of deception, fraud, and misrepresentation. Requiring a charity to

comply with the ordinance's requirements and to obtain a permit for soliciting a contribution and disclosing to the public the information submitted by the charity protects the residents of Pinellas County and rationally relates to the county's legitimate interest in preventing deception, fraud, and misrepresentation. *See Riley,* 487 U.S. at 814, 108 S.Ct. 2667; *American Charities,* 32 F.Supp.2d at 1316; *see also Village of Schaumburg,* 444 U.S. at 637, 100 S.Ct. 826 (recognizing the legitimate public interest of preventing fraud in charitable solicitations).

### B. The Burden on Interstate Commerce

The Commerce Clause forbids imposition by an ordinance of a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits" of the ordinance. *Pike,* 397 U.S. at 142, 90 S.Ct. 844. "[T]he extent of the burden [on interstate commerce] that will be tolerated will . . . depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact of interstate activities." *Pike,* 397 U.S. at 142, 90 S.Ct. 844. The charities contend that the burden on an out-of-state charitable organization imposed by the ordinance's "regulatory regime" is "clearly excessive" compared to the local putative benefits (Docs. 43 & 61).[49] Yet the charities, who bear the burden of proof, fail to demonstrate that the burden on an out-of-state charitable organization clearly exceeds the benefit of the ordinance. The charities assert (1) that both Public Citizen's and Greenpeace's "commerce with Pinellas County has dropped off substantially because of their cessation of efforts to communicate with potential contribu-

---

**49.** Because the county fails to sufficiently justify under the First Amendment the current permit and renewal fees charged by the department, no need exists to determine whether the fees violate the Commerce Clause.

tors," (Docs. 43 & 46–48) and (2) that any charity that has a permit denied or revoked by the county or that decides not to register with the department loses an opportunity to engage in interstate commerce (Docs. 43, 50, 51, 53, 54, & 56). In addition, the charities complain of the operational costs imposed by the ordinance, including the necessary changes to the charities' business practices. Finally, the charities contend that if other local jurisdictions institute a similar ordinance, the aggregate administrative burden and cost would outweigh the county's legitimate local interest and bankrupt charities. The charities argue that charitable solicitation ordinances such as Pinellas County's lead to the " 'balkanization' of charitable solicitation activity nationwide," forcing charities to change or cease charitable appeals in any jurisdiction with a burdensome ordinance or to expend precious contributions on changing solicitation and record-keeping practices to conform to the various regulations promulgated throughout the United States (Doc. 61).

Potential donors in Pinellas County use the information obtained through the ordinance's regulatory scheme in charitable donation decisions. For example, in January, 2001, the department received twenty-five telephone inquiries relating to charities and in November, 2001, the department received twenty-one inquiries (Doc. 71, Ex. 5). The county also discloses information about registered charities on the county's website, although the record contains no evidence of the "hits" received by the pertinent webpages. *See* http://www.pinellascounty.org/consumer/charity_ordinance.htm. In addition, the county receives few complaints of deception, fraud, or misrepresentation by a charity. In the twelve years preceding March, 2002, the department received only 31 complaints concerning a charity or a charitable solicitation and in the five years preceding March, 2002, the department re-

ceived no written complaint of deception, fraud, or misrepresentation in connection with a solicitation or of misuse or conversion of contributions by a charitable organization (Doc. 44, Exs. 3 & 4). Although nothing submitted by the parties conclusively attributes the low number of complaints to the ordinance's regulatory scheme, overall the record indicates that the ordinance generates local putative benefits, which benefits are not demonstrably and clearly exceeded by the burden imposed on interstate commerce. Further, the county cannot promote the ordinance's purpose "with a lesser impact on interstate activities." The alternative, either no regulation or a regulation targeted at in-state organizations, would defeat the ordinance's legitimate goal. *See American Target,* 199 F.3d at 1254. Finally, *Pike* focuses on whether the burden on interstate commerce is "clearly excessive" in relation to the local benefits of the Pinellas County ordinance, and no authority supports finding a violation of the Commerce Clause based on the speculative burden imposed by an amalgamation of currently non-existent ordinances. *See* 397 U.S. at 142, 90 S.Ct. 844. In short, the charities fail to demonstrate that the ordinance violates the Commerce Clause.

## V. SEVERANCE OF UNCONSTITUTIONAL PROVISIONS

The severability issue in this instance is simple. Severance of an unconstitutional provision from a local ordinance raises a question of state law. *See City of Lakewood,* 486 U.S. at 772, 108 S.Ct. 2138. Florida requires severance of offending provisions and enforcement of the balance of an ordinance if the unconstitutional provisions are distinguishable and separable from the remainder and if the balance of the ordinance accomplishes the legislative intent of the law. *See Cafe Erotica,* 360 F.3d at 1292 (quotations omitted); *Granite*

*State Outdoor Adver. v. City of St. Pete Beach, Fla.*, 2004 WL 792736, \*4 (M.D.Fla. Jan.13, 2004). Of course, severance must cure the constitutional violations.

The defects in the Pinellas County charitable solicitation ordinance result from insufficient limits on (1) the director's promulgation of application forms; (2) the department's capacity to prevent an applicant from soliciting in the county by either indefinitely suspending decision on a permit or refusing to characterize an application as a "proper" filing; and (3) the application fees. Severance of offending provisions and enforcement of the balance of the ordinance obviously would aggravate the ordinance's unconstitutionality because the constitutional violations result from the insufficiency or absence of limits in the ordinance and not from an excess in some affirmative obligation contained in the ordinance. Only the inclusion of further limits, rather than severance of existing provisions, cures the ordinance's constitutional violations. In short, the unconstitutional provisions of the county's ordinance in this instance are not severable from the balance of the enactment.

## VI. CONCLUSION

In sum, the plaintiffs' motion for summary judgment (Doc. 42) is **GRANTED IN PART** and **DENIED IN PART** and the defendants' motion for summary judgment (Doc. 59) is **GRANTED IN PART** and **DENIED IN PART**. The defendants are **ENJOINED**, pending pertinent amendment consistent with this order, from enforcement of (1) the Pinellas County charitable solicitation ordinance, Pinellas County Code Sections 42–266 to 42–344; (2) the department's current "Charitable Solicitation New Permit Application," "Charitable Solicitation Renewal Application," and "Charitable Solicitation Late Renewal Application;" and (3) the permit application fees. In addition, the fourth claim in the plaintiffs' complaint (Doc. 1) is

**DISMISSED AS MOOT.** The Clerk is directed to enter judgment consistent with this order.

To preserve the status quo pending any post-judgment motion, including a motion to stay injunctive relief pending either any appeal or other proceeding, this order's award of injunctive relief is **STAYED** until either **June 30th, 2004,** or disposition of any pertinent motion to stay, whichever occurs later.